IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

MICKEY JENKINS,                )
                               )
        Plaintiff,             )
                               )   Civil Action No. 11-1589
    v.                         )
                               )   Judge Nora Barry Fischer
MICHAEL J. ASTRUE,             )
Commissioner of Social Security, )
                               )
        Defendant.             )

## **MEMORANDUM OPINION**

I. **INTRODUCTION**

Mickey Jenkins ("Plaintiff") brings this action pursuant to 42 U.S.C. § 405(g), seeking review of the final determination of the Commissioner of Social Security ("Defendant" or "Commissioner") denying his application for supplemental security income ("SSI") under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381 – 1383f ("Act"). This matter comes before the court on cross motions for summary judgment. (ECF Nos. 12, 16). The record has been developed at the administrative level. For the following reasons, Plaintiff's Motion for Summary Judgment is DENIED, and Defendant's Motion for Summary Judgment is GRANTED.

## II. PROCEDURAL HISTORY

Plaintiff applied for SSI on June 19, 2008, claiming a disability onset of June 1, 2008. (R. at 114 – 20)[1]. His alleged inability to work full-time stemmed from a number of physical and mental impairments including head, back, and leg injuries, and bipolar disorder. (R. at 128). Plaintiff was initially denied benefits on October 15, 2008. (R. at 69 – 73). A hearing was scheduled for January 27, 2010, and Plaintiff appeared to testify, represented by counsel. (R. at 25 – 66). A vocational expert also testified. (R. at 25 – 66). The Administrative Law Judge ("ALJ") issued his decision denying benefits to Plaintiff on March 15, 2010. (R. at 7 – 24). Plaintiff filed a request for review of the ALJ's decision by the Appeals Council, which request was denied on October 11, 2011, thereby making the decision of the ALJ the final decision of the Commissioner. (R. at 1 – 4).

Plaintiff filed his Complaint in this court on December 19, 2011. (ECF No. 3). Defendant filed his Answer on April 24, 2012. (ECF No. 6). Cross motions for summary judgment followed. (ECF Nos. 12, 16).

## III. STATEMENT OF FACTS

### A. Plaintiff's General Background

Plaintiff was born on August 17, 1988 and was twenty-one[2] years of age at the time of his administrative hearing. (R. at 31). Plaintiff was a high school graduate, and received vocational training in heating, air conditioning, and drafting. (R. at 32, 38). Just prior to Plaintiff's junior year of high school, he was involved in a severe accident on his all-terrain vehicle ("ATV") when he collided head-on into an automobile. (R. at 179). Among other things, Plaintiff

---

[1] Citations to ECF Nos. 7 – 7-10, the Record, *hereinafter*, "R. at __".

[2] Plaintiff is defined as a, "Younger Person." 20 C.F.R. §§ 404.1563, 416.963.

required five plates to be inserted into his head and a rod into his right leg. (R. at 39 – 40). Plaintiff has since continued to live in the same home as his mother, stepfather, stepbrother, and sister. (R. at 45). His mother and stepfather do most of the cooking and laundry, and his sister mows the lawn. (R. 53 – 54). Plaintiff helps his mother around the house while she is at work by doing the dishes, sweeping the floor, taking out small items of trash, and caring for their two puppies. (R. at 53 – 54). Plaintiff subsisted on the support of his parents, and he received medical benefits and food stamps through the state. (R. at 44 – 45).

Plaintiff was last employed between May and August 2008 at a local Shop and Save grocery store as a stockperson for frozen foods and dairy products. (R. at 35 – 36). He voluntarily quit this position due to difficulties with co-workers and a supervisor. (R. at 37). Prior to his time at Shop and Save, Plaintiff had also been employed at J and J Mechanical in 2007, where he worked with a plasma cutter to produce ductwork out of sheet metal. (R. at 38). He was laid off after four or five months. (R. at 38).

Plaintiff also worked as a volunteer firefighter for a local company. (R. at 34 – 35). However, following his ATV accident, it was increasingly difficult for him to perform regular firefighting duties, and he was relegated mostly to directing traffic following automobile collisions once or twice every other month. (R. at 34 – 35).

B. <u>Plaintiff's Medical History</u>

In Plaintiff's disability report he claimed that the metal rod in his leg, his head injury, and his diagnosis of bipolar disorder limited his ability to work. (R. at 128). He asserted that since the ATV accident, he had difficulty interacting with others, could only walk 500 feet before needing a ten to twenty minute rest, could only pay attention for 15 minutes, and had trouble finishing activities. (R. at 142). Plaintiff felt pain when squatting, bending, or experiencing a

temperature change. (R. at 145). Since January 27, 2010, Plaintiff had been taking Celexa,[3] Trazodone,[4] and Vistaril.[5] (R. at 42).

### 1. *Physical History*

On June 4, 2006, Plaintiff collided with a van, head -on, while driving his ATV without a helmet. (R. at 179). He was flown by helicopter from the accident scene to West Virginia University Hospital. (R. at 179). After being admitted to the Surgical Intensive Care Unit, Plaintiff was taken to the operating room for right frontal craniotomy neurosurgery,[6] facial plastic surgery, right tibia IM nail surgery,[7] and closure of the thigh laceration that he sustained. (R. at 172). Plaintiff then had right orbital rim roof[8] and lateral orbital wall[9] reconstruction by ophthalmological surgeons. (R. at 172). He was discharged from the hospital on June 12, 2006 with several diagnoses including: depressed skull fracture,[10] right distal tibia shaft fracture,[11]

---

[3] Celexa is the brand name for Citalopram, which is used to treat depression. It works by increasing the amount of serotonin, a natural substance in the brain that helps maintain mental balance. PubMed Health, Citalopram, *available at* http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0001041/ (last visited June 13, 2012).

[4] Trazodone is used to treat depression. It works by increasing the amount of serotonin, a natural substance in the brain that helps maintain mental balance. PubMed Health, Trazodone, *available at* http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000530/(last visited June 13, 2012).

[5] Vistaril is the brand name of Hydroxyzine, which is used for anxiety and to treat the symptoms of alcohol withdrawal. PubMed Health, Hydroxyzine, *available at* http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000796/ (last visited June 13, 2012).

[6] Craniotomy neurosurgery is the operation and "opening into the skull." STEDMAN'S MEDICAL DICTIONARY 455 (28th ed. 2006).

[7] IM stands for Intramedullary rod that goes within the bone marrow. The tibia is the medial and larger of the two bones of the leg, articulating with the femur, fibula, and talus. STEDMAN'S MEDICAL DICTIONARY 1989 (28th ed. 2006).

[8] The orbital roof is "formed by the orbital plate of the frontal bone and the lesser wing of the sphenoid bone, the optic canal opens at its posterior limit; an indentation, the fossa for the lacrimal gland, is located in the anterolateral part of the roof." STEDMAN'S MEDICAL DICTIONARY 1703 (28th ed. 2006).

[9] The orbit is the "bony cavity containing the eyeball and its adnexa; it is formed of parts of seven bones." STEDMAN'S MEDICAL DICTIONARY 1376 (28th ed. 2006). Lateral means "on the side." *Id.* at 1050

[10] The term depressed is described as being "flattened from above downward or below the normal level or the level of the surrounding parts." STEDMAN'S MEDICAL DICTIONARY 515 (28th ed. 2006).

right acetabular fracture,[12] right orbital bone fracture, L1 transverse process fracture,[13] right thigh laceration, and subarachnoid hemorrhage.[14] (R. at 174, 177). Upon discharge, he was prescribed Erythromycin ophthalmic ointment,[15] Senokot,[16] Colace,[17] an insulin sliding scale,[18] Famotidine,[19] and Clindamycin.[20] (R. at 174).

---

[11] Distal is defined as "situated away from the center of the body, or from the point of origin; specifically applied to the extremity or distant part of a limb or organ." STEDMAN'S MEDICAL DICTIONARY 572 (28th ed. 2006). The shaft of the tibia is the triangular body of tibia between its expanded proximal and distal ends." *Id.* at 1757.

[12] Acetabular relates to the acetabulum , which is a "cup shaped depression on the external surface of the hip bone, with which the head of the femur articulates." STEDMAN'S MEDICAL DICTIONARY 11 (28th ed. 2006).

[13] L1 refers to the lumbar spinal nerve 1. The lumbar is "relating to the loins, or the part of the back and sides between the ribs and the pelvis." STEDMAN'S MEDICAL DICTIONARY 1121 (28th ed. 2006). Transverse means "crosswise; lying across the long axis of the body or of a part." *Id.* at 2021.

[14] Hemorrhage is an "escape of blood from the intravascular space," and the Subarachnoid is the "membrane under the portion of the brain that lies within cranial cavity and surrounds the brain and cranial portion." STEDMAN'S MEDICAL DICTIONARY 872, 1854 (28th ed. 2006).

[15] Erythromycin Ophthalmic ointment is an antibiotic ointment used to prevent infections. PubMed Health, Erythromycin ophthalmic ointment, *available at* http://www.ncbi.nlm.nih.gov/pubmed/6562258 (last visited June 13, 2012).

[16] Senokot is the brand name for Senna, which is used to treat constipation. It also is used to empty the bowels before surgery and certain medical procedures. It works by increasing activity of the intestines to cause a bowel movement. PubMed Health, Senna, *available at* http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000099/ (last visited June 13, 2012).

[17] Colace is a stool softener used on a short-term basis to relieve constipation by people who should avoid straining during bowel movements because of heart conditions, hemorrhoids, and other problems. PubMed Health, Stool Softeners, *available at* http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000100/(last visited June 13, 2012).

[18] Sliding scale insulin is a commonly used regimen for glucose management for hospitalized patients with diabetes mellitus. PubMed Health, Computer order entry system decreased use of sliding scale insulin regimens, *available at* http://www.ncbi.nlm.nih.gov/pubmed/12425238 (last visited June 13, 2012).

[19] Famotidine is used to treat ulcers (sores on the lining of the stomach or small intestine); gastroesophageal reflux disease (GERD, a condition in which backward flow of acid from the stomach causes heartburn and injury of the esophagus and conditions where the stomach produces too much acid). It works by decreasing the amount of acid made in the stomach. PubMed Health, Famotidine, *available at* http://www.ncbi.nlm.nih.gov/pubmedhealth/ PMH0000872/(last visited June 13, 2012).

[20] Clindamycin is used to treat certain types of bacterial infections, including infections of the lungs, skin, blood, female reproductive organs, and internal organs. It works by slowing or stopping the growth of bacteria. PubMed Health, Clindamycin, *available at* http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000672/ (last visited June 13, 2012).

Plaintiff's final follow up examination for the injuries he suffered in the ATV accident occurred on July 17, 2006. (R. at 238). Medical records from this exam provide:

> "No detectable interval change in the position and configuration of the residual orbital fracture fragments or the metallic mesh and screw fixation. There had been interval development of pneumocephalus[21] and more gas was identified in the superior aspect of the right orbit. Parenchymal[22] volume loss compatible with posttraumatic encephalomalacia[23] was noted on the right frontal lobe."

(R. at 239).

Plaintiff attended physical therapy sessions subsequent to his hospital discharge. (R. at 146). In Plaintiff's functional disability report filed on July 17, 2008, Plaintiff reported that pain from his medical procedures was constant from his knee down and worsened throughout the day. (R. at 145 – 146). Plaintiff also stated that he had difficultly with his memory, experienced restless sleep, and could only walk five hundred feet before needing to rest. (R. at 140, 142). Furthermore, Plaintiff stated that he had lost 50 pounds since the accident. (R. at 146).

On November 26, 2008, Plaintiff visited Stephanie H. Le, M.D. at Jefferson Pain and Rehabilitation Center to receive a Caudal Epidural[24] for his back pain. (R. at 304). He also received a Vicodin prescription and instructions for a CT Scan and knee X-rays. (R. at 304). On December 12, 2008, Plaintiff received a CT scan to aid in his treatment for lower back pain and leg numbness. (R. at 307). The image showed an asymmetric disc bulging centrally and to the

---

[21] Pneumocephalus is the "presence of air or gas within the cranial cavity." STEDMAN'S MEDICAL DICTIONARY 1522 (28th ed. 2006).

[22] Parenchyma is "the distinguishing or specific cells of a gland or organ, contained in and supported by the connective tissue framework." STEDMAN'S MEDICAL DICTIONARY 1424 (28th ed. 2006).

[23] Encephalomalacia is the "abnormal softness of the cerebral parenchyma often due to ischemia (local loss of blood supply due to mechanical obstruction of the blood vessel) or infarction (an area of tissue death caused by impairment of arterial or venous blood supply due to mechanical factors or blood pressure altercations)." STEDMAN'S MEDICAL DICTIONARY 635, 968, 1001 (28th ed. 2006).

[24] Caudal Epidural refers to an epidural injection with local anesthetics and steroids used in managing chronic low back pain and lower extremity pain of various causes. PubMed Health, Caudal epidural injections in the management of chronic low back pain, *available at* http://www.ncbi.nlm.nih.gov/pubmed/22622911 (last visited June 14, 2012).

left in Plaintiff's spine. (R. at 307). He also received X-rays of both knees. (R. at 306). The X-ray images revealed a slight lateral patellar subluxation[25] in his right knee, and his left knee was normal. (R. at 306).

A pain management report dated December 17, 2008 indicated that Plaintiff's back and leg pain had decreased by 40% and that the new medications were helping to ease his pain. (R. at 301). On February 11, 2009, another pain management assessment was conducted and showed that his pain increased with activities and weather change and that his back pain on the right side had worsened. (R. at 300). On the same day, Plaintiff received a Lumbar Facet Injection[26] to treat his lower back pain. (R. at 299). On April 8, 2009, another pain management report revealed that Plaintiff's pain had increased and he had developed neck spasms. (R. at 298). The report also stated that he had stopped taking Vicodin two weeks prior to this report due to the unavailability of the medication because of an order back-up. (R. at 298). Plaintiff received another Caudal Epidural on July 15, 2009. (R. at 297).

2. *Psychiatric History*

On December 3, 2007, Kelly Minster, M.S. and Cynthia Arnold, M.H. conducted an intake interview with Plaintiff at Chestnut Ridge Counseling Services after he got into a verbal altercation with his girlfriend, punched a fence, and conveyed thoughts of suicide to his mother.[27] (R. at 252). Plaintiff was then scheduled for a psychiatric evaluation and a follow-up

---

[25] Patellar subluxation is "an incomplete dislocation, although contact between joint surfaces remains" of the "large bone that combines the tendon of the quadriceps femoris, covering the anterior surface of the knee." STEDMAN'S MEDICAL DICTIONARY 1441,1856 (28th ed. 2006).

[26] Lumbar facet injection refers to an injection of local anesthetic in the facet joints of the spine to relieve lower back pain. PubMed Health, Are diagnostic lumbar facet injections influenced by pain of muscular origin, *available at* http://www.ncbi.nlm.nih.gov/pubmed/17173609 (last visited June 14, 2012).

[27] Plaintiff's mother immediately called the crisis number after she heard his ideations of suicide. (R. at 252).

appointment with Ms. Minster and Ms. Arnold. (R. at 252). Plaintiff only attended two of his scheduled follow-up appointments.[28] (R. at 243 – 251).

On December 12, 2007, Plaintiff met with Bonita Wardle-Roche, C.R.N.P. from Chestnut Ridge Counseling Services to address his complaints of irritability, difficulty controlling his anger, and agitation.[29] (R. at 241). Plaintiff was diagnosed with Bipolar Disorder with moderately severe psychosocial stressors and a Global Assessment of Functioning ("GAF") score of 58.[30] (R. at 242). As a result of these findings, he was prescribed Depakote[31] and Seroquel,[32] and a follow-up appointment was scheduled to evaluate the effectiveness of these

---

[28] He cancelled or rescheduled all appointments except for two. (R. at 243 – 251).

[29] It is noted that Plaintiff had been to therapy before for depression, but never received any medication. (R. at 241).

[30] The Global Assessment of Functioning Scale ("GAF") assesses an individual's psychological, social and occupational functioning with a score of 1 being the lowest and a score of 100 being the highest. The GAF score considers "psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." *American Psychiatric Association: Diagnostic and Statistical Manual of Mental Disorders* (DSM-IV-TR) 34 (4th ed. 2000). An individual with a GAF score of 91 – 100 exhibits "[s]uperior functioning in a wide range of activities" and "no symptoms;" of 81 – 90 exhibits few, if any, symptoms and "good functioning in all areas," is "interested and involved in a wide range of activities," is "socially effective," is "generally satisfied with life," and experiences no more than "everyday problems or concerns;" of 71 – 80, may exhibit "transient and expectable reactions to psychosocial stressors" and "no more than slight impairment in social, occupational, or school functioning;" of 61 – 70 may have "[s]ome mild symptoms" or "some difficulty in social, occupational, or school functioning, but generally functioning pretty well" and "has some meaningful interpersonal relationships;" of 51 – 60 may have "[m]oderate symptoms" or "moderate difficulty in social, occupational, or school functioning;" of 41 – 50 may have "[s]erious symptoms (e.g., suicidal ideation …)" or "impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job);" of 31 – 40 may have "[s]ome impairment in reality testing or communication" or "major impairment in several areas, such as work or school, family relations, judgment, thinking or mood;" of 21 – 30 may be "considerably influenced by delusions or hallucinations" or "serious impairment in communication or judgment (e.g., … suicidal preoccupation)" or "inability to function in almost all areas;" of 11 – 20 may have "[s]ome danger of hurting self or others" or "occasionally fails to maintain minimal personal hygiene" or "gross impairment in communication;" of 1 – 10 may have "[p]ersistent danger of severely hurting self or others" or "persistent inability to maintain minimal personal hygiene" or "serious suicidal act with clear expectation of death." *Id.*

[31] Depakote is the brand name for Valproic Acid, which is used to treat certain types of seizures. Valproic acid is also used to treat mania in people with bipolar disorder. It works by increasing the amount of a certain natural substance in the brain. PubMed Health, Valproic Acid, *available at* http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH000067/ (last visited June 13, 2012).

[32] Seroquel is the brand name for Quetiapine which is used to treat the symptoms of schizophrenia, episodes of mania, or depression in patients with bipolar disorder. It works by changing the activity of certain natural

medications. (R. at 242). On January 18, 2008, Plaintiff met with Ms. Roche and reported that his anger and irritability had improved, resulting in fewer mood swings and less aggression, but that the Seroquel made him excessively drowsy. (R. at 245). Ms. Roche found that his depression had decreased and that he did not experience anxiety or suicidal thoughts. (R. at 245). Moreover, his speech was clear, appropriate, and logical. (R. at 245). Plaintiff's Seroquel prescription was reduced, and his Depakote prescription remained the same. (R. at 245).

On September 8, 2008, after Plaintiff filed for SSI, he was evaluated by Thomas E. Andrews, Ph.D. from the Bureau of Disability Determination. (R. at 264). In this evaluation, Plaintiff reported that he could not work because when he was on his feet for an extended period of time, his right leg would give out and his lower back would hurt. (R. at 264). He also complained of headaches, bipolar disorder, and swelling of the right eye. (R. at 265). Plaintiff reported that he ate once or twice a day, and he denied any weight loss or gain. (R. at 264). Dr. Andrews diagnosed Plaintiff with adjustment disorder[33] with mixed mood of anxiety, depression, and hyperirritability features. (R. at 267). His prognosis was fair for improvement with treatment compliance. (R. at 267). Additionally, Dr. Andrews noted that Plaintiff was independent and engaged in light recreational activities with friends and around his residence, and that his relationships with others were generally adequate. (R. at 267). The evaluation revealed no evidence of manic episodes or significant depression and that Plaintiff was able to perform all tasks with consistent concentration. (R. at 267). Any potential problems with

---

substances in the brain. PubMed Health, Quetiapine, *available at* http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0001030/ (last visited June 13, 2012).

[33] "Adjustment disorder is a group of symptoms, such as stress, feeling sad or hopeless, and physical symptoms that can occur after you go through a stressful life event. The symptoms occur because you are having a hard time coping, and the reaction is stronger or greater than what would be expected for the type of event that occurred." PubMed Health, Adjustment Disorder, *available at* http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0001928/ (last visited June 14, 2012).

concentration are instead attributable to his borderline intellectual functioning level. (R. at 267). Dr. Andrews ranked most of Plaintiff's functional limitations as moderate, and affirmed that his abilities to understand, remember, and carry out instructions are affected by his impairment. (R. at 269).

On October 1, 2008, Plaintiff admitted to Ms. Arnold that he had been delinquent in attending counseling earlier in the year, but that he wanted to try again. (R. at 326). Plaintiff also told her that he was unable to keep his job due to back pain. (R. at 326). Plaintiff took an Anger Inventory on October 22, 2008, which indicated that he did not easily explode with anger. (R. at 325). Plaintiff continued to engage in counseling sessions until February 19, 2009 to work on his interpersonal relationships and address his traumatic flashbacks from the ATV accident. (R. at 308 – 315).

Concurrent with his counseling sessions, on October 7, 2008, a Mental Residual Functional Capacity Assessment was completed by Douglas Schiller, Ph.D. (R. at 271). Plaintiff's abilities were found to be consistent with the results of Dr. Andrews's evaluation and the evidence found in the medical file. (R. at 273). In the assessment, it was reported that Plaintiff was able to meet the basic mental demands of competitive work on a sustained basis, despite the limitations resulting from his impairments. (R. at 273). He could carry out very short and simple instructions. (R. at 273). In addition, his daily living activities were only mildly limited. (R. at 284). Further, Plaintiff exhibited moderate difficulty in social functioning, as well as concentration, persistence, and pace. (R. at 284). A Physical Residual Functional Capacity Assessment was completed by Frank Chiarelli, on October 15, 2008. (R. at 291). No medically determinable impairments were established, and a physical exam showed no

abnormalities. (R. at 292). Mr. Chiarelli found that Plaintiff's statements were partially credible. (R. at 292).

On November 27, 2009, Plaintiff checked himself into the Psychiatric Care Unit of Highlands Hospital because of suicidal ideation and homicidal ideation towards his stepfather. (R. at 337, 339). Plaintiff reported having an abusive family and complained that his Seroquel and Depakote prescriptions exacerbated his feelings of irritability and anger. (R. at 340). Plaintiff was found to have depressive mood disorder due to head injury and marijuana abuse. (R. at 340). It was also noted that his intelligence was average, and he exhibited some irritability and excessive guilt about his condition and inability to care for his mother. (R. at 340). Plaintiff remained in the hospital for five days. (R. at 344). Plaintiff was prescribed Celexa and Trazodone upon his discharge. (R. at 344). He remained in counseling until January 19, 2010.[34] (R. at 308).

According to Plaintiff's psychiatric evaluation performed by Elizabeth Vesely, P.A.C. at Chestnut Ridge Services on December 8, 2009, Plaintiff had been receiving anger management treatment since age four. (R. at 347). By December 8, 2009, Plaintiff stopped taking Depakote because he said it worsened his mood. (R. at 347). He also stopped taking Seroquel because it made him tired. (R. at 347). The evaluation indicated that Plaintiff did not drink alcohol, but he had been smoking marijuana from age eighteen until he discontinued his usage two weeks prior to the evaluation. (R. at 347). Plaintiff was diagnosed with mood disorder, impulse control disorder, cannabis abuse, and a GAF of 50. (R. at 348). Plaintiff's prescription for Celexa remained the same, but the Trazadone was increased due his inability to sleep. (R. at 349). On

---

[34] A Mental Residual Functional Capacity Questionnaire was completed that same day, which indicated that Plaintiff had mood disorders, depression, paranoid thinking, memory impairment, poor impulse control, unstable interpersonal relationships, and a GAF of 55. (R. at 293-296).

11

January 19, 2010, Plaintiff obtained a prescription for Vistaril, which was ordered by Ms. Vesely. (R. at 333).

    C. <u>Administrative Hearing</u>

At his hearing, Plaintiff complained of back, leg, and hip pain as a result of his ATV accident, and placed his pain range from four to seven, on a scale of zero to ten. (R. at 41, 44). Plaintiff testified that he could probably walk a quarter of a mile, though with some degree of pain, and could stand for about ten minutes before needing to sit down due to knee pain. (R. at 47). Furthermore, he stated he had the ability to bend and squat, but only to a certain point before his knees would pop and he would lose balance. (R. at 48). Plaintiff reported that he could only lift a couple of pounds, and that when he lifted fifteen to twenty pounds at Shop and Save, his lower back gave out. (R. at 49). He attested that the longest he could sit was for ten to fifteen minutes unless he had a cushion, and he would usually lie on his stomach to watch television or play videogames. (R. at 49 – 50). At night, Plaintiff had some trouble sleeping due to discomfort in his back; although, this had improved significantly with medication. (R. at 52).

Plaintiff also testified regarding his psychological impairments. He maintained that he could not be around groups of more than five people in public places, because he was paranoid that they were all looking at him and talking about him. (R. at 41, 50). At home, Plaintiff had trouble getting along with his stepfather on a daily basis, because he perceived his stepfather to be mistreating his mother. (R. at 45 – 46). He reported being treated at Chestnut Ridge Counseling every two to three weeks because of troubled relationships with his family members. (R. at 46). When questioned by his representative, Plaintiff explained that his anger was not solely directed at his stepfather, and could be aimed at anyone. (R. at 56). He admitted to punching and throwing things when frustrated. (R. at 56). Plaintiff stated that he started having

suicidal thoughts six months after his ATV accident, and that such thoughts had only worsened with time. (R. at 57). He also mentioned that he discontinued his counseling at Chestnut Ridge in the past, due to problems with his therapist. (R. at 57).

Additionally, Plaintiff testified to his use of medications and recreational drugs. (R. at 42 – 51). At the time of the hearing, he was taking Celexa to keep his mood swings in balance, Trazodone to help him sleep, and Vistaril to minimize his anxiety. (R. at 42). He reported that because the pain medications and injections were not easing his pain, he had stopped going to the pain clinic. (R. at 43). On a regular basis, Plaintiff used ibuprofen or a hot bath to ease his discomfort. (R. at 44). Plaintiff had also been smoking marijuana since his ATV accident to decrease his pain level. (R. at 43). He stated that he smoked marijuana in the quantity of a "dime bag a day," which was "just enough to ease the pain." (R. at 51). He had smoked cigarettes since he was eighteen, and smoked eight cigarettes to a pack, per day. (R. at 51, 52).

A typical day for Plaintiff began at 8:00 a.m. (R. at 52). Plaintiff was capable of dressing himself, doing dishes, sweeping the floors, and vacuuming until it became too painful to continue. (R. at 52, 53). Plaintiff made a hobby of building little model cars, but it "doesn't interest him as much anymore." (R. at 54).

Following Plaintiff's testimony, the ALJ asked the vocational expert what jobs would be available in significant numbers in the national economy to a hypothetical person of Plaintiff's age, educational background, and work experience, if limited to light exertional, unskilled work involving lifting ten pounds frequently and twenty pounds occasionally, and standing and walking up to six hours a day, sitting up to six hours a day, and allowing for no climbing of ladders, ropes, or scaffolds, only occasional use of ramps or stairs, or postural movements such a balancing, stooping, and crouching, and no concentrated exposure to temperature extremes,

vibrations, or workplace hazards such as unprotected heights and moving machinery. (R. at 61 – 62). Further, the work would not require more than occasional contact with co-workers and supervisors, no contact with the public, and no rapid production quotas. (R. at 61 – 62). The hypothetical person would work primarily with things and not people. (R. at 62). In response, the vocational expert explained that such a person could engaged in work as a "laundry folder," with 48,000 positions available in the national economy, as a "hand packer," with 202,000 positions available, as a "labeler and marker," with 64,000 positions available, or as an "inspector/checker," with 111,000 positions available. (R. at 62 – 63).

The ALJ went on to ask whether jobs would be available to a hypothetical person with the exact limitations attested to by Plaintiff. (R. at 63 – 64). The vocational expert replied that no jobs would be available to such a person. (R. at 64). Moreover, a hypothetical person prone to similar outbursts of anger would need to behave in an emotionally stable manner in the workplace, as after one warning, such a person would likely be terminated from employment. (R. at 65).

## IV. STANDARD OF REVIEW

To be eligible for social security benefits under the Act, a claimant must demonstrate to the Commissioner that he or she cannot engage in substantial gainful activity because of a medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of at least twelve months. 42 U.S.C. §423(d)(1)(A); *Brewster v. Heckler,* 786 F.2d 581, 583 (3d Cir. 1986). When reviewing a claim, the Commissioner must utilize a five-step sequential analysis to evaluate whether a claimant has met the requirements for disability. 20 C.F.R. §§ 404.1520, 416.920.

The Commissioner must determine: (1) whether the claimant is currently engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment or a combination of impairments that is severe; (3) whether the medical evidence of the claimant's impairment or combination of impairments meets or equals the criteria listed in 20 C.F.R., Pt. 404, Subpt. P, App'x 1; (4) whether the claimant's impairments prevent him from performing his past relevant work; and (5) if the claimant is incapable of performing his past relevant work, whether he can perform any other work which exists in the national economy. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); *see Barnhart v. Thomas*, 540 U.S. 20, 24-25 (2003). If the claimant is determined to be unable to resume previous employment, the burden shifts to the Commissioner (Step 5) to prove that, given claimant's mental or physical limitations, age, education, and work experience, he or she is able to perform substantial gainful activity in jobs available in the national economy. *Doak v. Heckler*, 790 F.2d 26, 28 (3d Cir. 1986).

Judicial review of the Commissioner's final decisions on disability claims is provided by statute, and is plenary as to all legal issues. 42 U.S.C. §§ 405(g)[35], 1383(c)(3)[36]; *Schaudeck v. Comm'r of Soc. Sec.*, 181 F. 3d 429, 431 (3d Cir. 1999). Section 405(g) permits a district court to review the transcripts and records upon which a determination of the Commissioner is based;

---

[35] Section 405(g) provides in pertinent part:

> Any individual, after any final decision of the [Commissioner] made after a hearing to which he was a party, irrespective of the amount in controversy, may obtain a review of such decision by a civil action ... brought in the district court of the United States for the judicial district in which the plaintiff resides, or has his principal place of business

42 U.S.C. § 405(g).

[36] Section 1383(c)(3) provides in pertinent part:
> The final determination of the Commissioner of Social Security after a hearing under paragraph (1) shall be subject to judicial review as provided in section 405(g) of this title to the same extent as the Commissioner's final determinations under section 405 of this title.

42 U.S.C. § 1383(c)(3).

the court will review the record as a whole. *See* 5 U.S.C. §706. The district court must then determine whether substantial evidence existed in the record to support the Commissioner's findings of fact. *Burns v. Barnhart,* 312 F. 3d 113, 118 (3d Cir. 2002).

Substantial evidence is defined as "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate" to support a conclusion. *Ventura v. Shalala*, 55 F. 3d 900, 901 (3d Cir. 1995) (quoting *Richardson v. Perales,* 402 U.S. 389, 401 (1971)). If the Commissioner's findings of fact are supported by substantial evidence, they are conclusive. 42 U.S.C. § 405(g); *Richardson,* 402 U.S. at 390. When considering a case, a district court cannot conduct a *de novo* review of the Commissioner's decision nor re-weigh the evidence of record; the court can only judge the propriety of the decision in reference to the grounds invoked by the Commissioner when the decision was rendered. *Palmer v. Apfel*, 995 F. Supp. 549, 552 (E.D. Pa. 1998); *S.E.C. v. Chenery Corp.*, 332 U.S. 194, 196 – 97 (1947). The court will not affirm a determination by substituting what it considers to be a proper basis. *Chenery*, 332 U.S. at 196 – 97. Further, "even where this court acting *de novo* might have reached a different conclusion . . . so long as the agency's factfinding is supported by substantial evidence, reviewing courts lack power to reverse either those findings or the reasonable regulatory interpretations that an agency manifests in the course of making such findings." *Monsour Medical Center v. Heckler*, 806 F. 2d 1185, 90-91 (3d. Cir. 1986).

V. **DISCUSSION**

In his decision, the ALJ concluded that Plaintiff suffered medically determinable severe impairments in the way of residual effects of injuries obtained in an all-terrain vehicle accident in 2006 including a depressed fractured skull, L1 transverse process fracture, right distal tip shaft fracture, right acetabular fracture, and implantation of a metal rod in the right leg. (R. at 12).

Plaintiff also suffered from adjustment disorder, bipolar disorder, mood disorder, and cannabis abuse. (R. at 12). In spite of these impairments, the ALJ determined that Plaintiff was capable of engaging in light exertional work, allowing for a change of position from sitting to standing for ten minutes every hour, and not involving crawling, kneeling, climbing ladders, ropes, or scaffolds, doing more than occasional balancing, climbing ramps/stairs, crouching, and stooping, exposure to concentrated heat or cold, vibrations, dangerous machinery, or unprotected heights, rapid production quotas, more than occasional interaction with co-workers or supervisors, and any interaction with the general public. (R. at 15). Plaintiff should work primarily with things, and not people. (R. at 15). Relying upon the testimony of the vocational expert, the ALJ denied Plaintiff benefits because even with the aforementioned functional limitations, he was eligible for a significant number of jobs in existence in the national economy. (R. at 19 – 20).

Plaintiff's sole point of contention with the decision of the ALJ is in regards to the ALJ's treatment of Dr. Andrews' assessment of Plaintiff's mental limitations. (ECF No. 13 at 12 – 16). The ALJ's hypothetical question was allegedly not representative of Plaintiff's actual limitations, because it failed to include Dr. Andrew's findings that Plaintiff had "moderate" restrictions in his ability to:

1) Make judgments on simple work-related decisions;
2) Respond appropriately to work pressures in a usual work setting; and,
3) Respond appropriately to changes in a routine work setting.

(ECF No. 13 at 12; R. at 269). Defendant counters that the specified findings were not significant enough, alone, to warrant explicit inclusion in the hypothetical; yet, the findings were nonetheless accommodated, and Plaintiff's argument is without merit. (ECF No. 17 at 11 – 15).

When rendering a decision, an ALJ must provide sufficient explanation of his or her final determination to provide a reviewing court with the benefit of the factual basis underlying the

ultimate disability finding. *Cotter v. Harris*, 642 F. 2d 700, 705 (3d Cir. 1981) (citing *S.E.C. v. Chenery Corp.*, 318 U.S. 80, 94 (1943)). The ALJ need only discuss the most pertinent, relevant evidence bearing upon a claimant's disability status, but must provide sufficient discussion to allow the reviewing court to determine whether any rejection of potentially pertinent, relevant evidence was proper. *Johnson v. Comm'r of Soc. Sec.*, 529 F. 3d 198, 203 – 04 (3d Cir. 2008) (citing *Burnett v. Comm'r of Soc. Sec.*, 220 F. 3d 112, 121 (3d Cir. 2000); *Cotter*, 642 F. 2d at 706). In the present case, the ALJ adequately met his responsibilities under the law.

Plaintiff provides no evidence that the hypothetical question posed by the ALJ did not adequately accommodate Plaintiff's limitations, or that the aforementioned findings by Dr. Andrews were significant enough to require accommodation. Despite Dr. Andrew's finding that Plaintiff was moderately limited in his ability to make judgments on simple work-related decisions, the record clearly evidences that Plaintiff was capable of directing traffic as a volunteer firefighter. (R. at 17). Further, when being examined by Dr. Andrews, Plaintiff was capable of performing all tasks and answering all questions without any confusion, loss of concentration, difficulty with attention span, or difficulty with persistence or pace. (R. at 17). While Plaintiff had some difficulty with serial 3's, he was otherwise capable. (R. at 17). The ALJ provided that Plaintiff should only be engaged in "unskilled" work, which is defined as "work which needs little or no judgment to do simple duties that can be learned on the job in a short period of time." 20 C.F.R. §§ 404.1568(a), 416.968(a). Even if the ALJ erred in failing to explicitly mention the above limitation in his hypothetical, it was accommodated.

Moreover, with respect to Plaintiff's ability to function in "usual" and "routine" work settings, the alteration of the work environment as envisaged by the ALJ in his hypothetical presupposes that Plaintiff will not be working in either "usual" or "routine" settings.

Additionally, while a "substantial loss" of ability to deal with changes and pressures in a usual or routine work setting could justify a finding of disability, Dr. Andrews' finding of "moderate" limitation on his form, as opposed to the more severe options of "marked" and "extreme," does not demonstrate such a substantial loss. S.S.R. 96-9p, 1996 WL 374185 *9 (July 2, 1996); S.S.R. 85-15, 1985 WL 56857 *4 (1985). Presently, Plaintiff was limited to unskilled work, not involving a fast production pace, workplace hazards, or more than minimal interaction with other people. This was more than sufficient to accommodate Dr. Andrew's findings of moderate limitation.

### VI. CONCLUSION

Based upon the foregoing, the decision of the ALJ is supported by substantial evidence from Plaintiff's record. Reversal or remand of the ALJ's decision is not appropriate. Accordingly, Plaintiff's Motion for Summary Judgment is denied, Defendant's Motion for Summary Judgment is granted, and the decision of the ALJ is affirmed. Appropriate Orders follow.

<u>s/ Nora Barry Fischer</u>
Nora Barry Fischer
United States District Judge

Dated: September 10, 2012
cc/ecf: All counsel of record.